Alan WILLIS, Plaintiff,

v.

BIG LOTS, INC., et al., Defendants.

Case No. 2:12–cv–604

United States District Court, S.D. Ohio, Eastern Division.

Signed 03/17/2017

Austin P. Brane, Brian E. Cochran, David W. Mitchell, Kevin A. Lavelle, Lucas F. Olts, Robbins Geller Rudman & Dowd LLP, San Diego, CA, Brian K. Murphy, Joseph F. Murray, Murray Murphy Moul + Basil LLP, Columbus, OH, for Plaintiff.

John Joseph Kulewicz, William Darrell Kloss, Jr., Vorys Sater Seymour & Pease, Columbus, OH, Caitlin N. Fitzpatrick, David A. Herman, Matthew P. Hendrickson, Michael A. Paskin, Timothy G. Cameron, Cravath, Swaine & Moore LLP, New York, NY, for Defendants.

## OPINION AND ORDER

MICHAEL H. WATSON, JUDGE,
UNITED STATES DISTRICT COURT

Lead Plaintiff, City of Pontiac General Employees' Retirement System ("City of Pontiac"), moves for class certification as well as for appointment of itself and Teamsters Local 237 Additional Security Benefit Fund ("Local 237") as Class Representatives and the law firm Robbins Geller Rudman & Dowd LLP ("Robbins Geller") as Class Counsel. Mot. Certify, ECF No. 60. Defendants oppose, ECF No. 74, and move for leave to file a sur-reply, ECF No. 79. For the following reasons, Defendants' motion for leave to file a sur-reply is **DENIED**, and Plaintiffs' motion is **GRANTED**.

## I. BACKGROUND

A detailed description of the allegations in this case is set forth in the Court's January 21, 2016, Opinion and Order granting in part and denying in part Defendants' motion to dismiss. Opinion and Order, ECF No. 49. To summarize, Plaintiffs allege the following:

Big Lots, Inc. ("Big Lots") is a broadline closeout retailer whose stock is traded on the New York Stock Exchange ("NYSE"). Big Lots' business model involves sourcing merchandise through closeout deals, such as where the merchandise has been overproduced, discontinued, or rejected by other retailers. Big Lots' merchandising operations is divided into six categories.

Big Lots' performance had been marginal before the middle of fiscal year 2011. In response, Big Lots implemented new strategies focusing on the company's key merchandising categories and hired Doug Wurl ("Wurl") as Executive Vice President of Merchandising. Sales initially improved, but Wurl made changes to the merchandising operations that impaired the company's ability to meet sales targets going forward. For instance, Wurl attempted to move Big Lots away from its closeout business model and into a more conventional retail model. Wurl's strategy conflicted with the vision of other company leaders and often left merchandising employees having to implement inconsistent directives. Many merchandising employees were either fired by Wurl or left the company out of dissatisfaction. With Big Lots' merchandising capabilities significantly diminished, the company was eventually unable to meet sales targets across merchandise categories.

Nonetheless, Defendants provided false and misleading information—primarily via press releases, conference calls, and forms filed with the Securities and Exchange Commission—to investors regarding Big Lots' performance and prospects between March 2, 2012, and August 23, 2012, which artificially inflated the price of Big Lots' stock.

The truth of Big Lots' financial condition began to emerge on April 23, 2012, when Big Lots issued a press release (after the close of the markets for the day) updating financial forecasts for the first quarter of fiscal year 2012 and noting that the company expected U.S. store sales to be slightly negative compared to its March 2, 2012, guidance. On April 24, 2012, the price of Big Lots' stock plummeted 24% from its closing price the previous day. On August 23, 2012, Big Lots announced Wurl's resignation and released earnings results for the second quarter of fiscal year 2012, showing that Big Lots had failed to meet quarterly projections.[1] Big Lots' stock

---

1. The April 23, 2012, and August 23, 2012, disclosures are referred to herein as "corrective disclosures."

price fell 20.8% by the close of trading on August 23, 2012.

Throughout this period, between March 2, 2012, and August 23, 2012, Big Lots was buying back millions of shares of its own stock. At the same time, the individual defendants and other company insiders who knew the true state of the company sold large amounts of their own shares at the artificially inflated prices for proceeds exceeding $33 million.

The Court previously granted in part and denied in part Defendants' motion to dismiss. Opinion and Order, ECF No. 49. Lead Plaintiff City of Pontiac now seeks certification of a plaintiff Class consisting of:

All persons who purchased the common stock of Big Lots, Inc. between March 2, 2012 and August 23, 2012, and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

Mot. Cert. 1, ECF No. 60. City of Pontiac and Local 237 also seek appointment as Class Representatives and the appointment of Robbins Geller as Class Counsel.

## II. STANDARD OF REVIEW

A court may certify a class action only if it meets the requirements of Federal Rule of Civil Procedure 23(a) and either Rule 23(b)(1), (b)(2), or (b)(3).

Rule 23(a) sets forth four prerequisites that every class action must meet:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). In addition to meeting each of those four requirements, every class action must meet one of the following Rule 23(b) criterion:

(1) prosecuting separate actions by or against individual class members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controver-

sy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b).

This Court recently set forth the general rules that apply to any class certification analysis:

Plaintiff bears the burden of proof on her motion for class certification. *Golden v. City of Columbus,* 404 F.3d 950, 965 (6th Cir. 2005) (citing *Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)). The United States Supreme Court summarized that burden as follows:

The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only. To come within the exception, a party seeking to maintain a class action must affirmatively demonstrate his compliance with Rule 23. The Rule does not set forth a mere pleading standard. Rather, a party must not only be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a).

*Comcast v. Behrend,* 569 U.S. 27, 133 S.Ct. 1426, 1432, 185 L.Ed.2d 515 (2013) (internal quotations and citations omitted).

As for the Court's responsibility under Rule 23, it is well established that "certification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'" *Id.* (quoting *Wal–Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 131 S.Ct. 2541, 2551–52, 180 L.Ed.2d 374 (2011)). Oftentimes, that "rigorous analysis" requires the Court to "probe behind the pleadings before coming to rest on the certification question," which frequently will entail "overlap with the merits of the plaintiffs underlying claim." *Id.* "That is so because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* (internal quotations omitted).

The Supreme Court has cautioned, however, that "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Retirement Plans & Trust Funds,* 568 U.S. 455, 133 S.Ct. 1184, 1194–95, 185 L.Ed.2d 308 (2013) (citing *Wal–Mart Stores,* 131 S.Ct. at 2551). In other words, district courts may not "turn the class certification proceedings into a dress rehearsal for the trial on the merits." *In re Whirlpool,* 722 F.3d 838, 851–52 (6th Cir. 2013) (citing *Messner v. Northshore Univ. HealthSystem,* 669 F.3d 802, 811 (7th Cir. 2012)).

*McDonald v. Franklin Cty., Ohio,* 306 F.R.D. 548, 555–56 (S.D. Ohio 2015).

With these principles in mind, the Court proceeds to consider Plaintiffs' motion for class certification and Defendants' motion for leave to file a sur-reply. The Court does so in reverse order.

## III. ANALYSIS

### A. Motion for Leave to File Sur-reply

█ Defendants move to file a sur-reply to Plaintiffs' motion for class certification,

arguing that Plaintiffs advance new arguments in their reply brief to which Defendants must be afforded an opportunity to respond.

Local Rule 7.2(a)(2) prohibits the filing of any memoranda beyond a motion, response, and reply, except upon leave of court "for good cause shown." S.D. Ohio Civ. R. 7.2(a)(2).

Contrary to Defendants' contention, Plaintiffs did not raise new arguments for the first time in their reply brief. Plaintiffs' reply brief was properly limited to responding to arguments Defendants raised in their response. Accordingly, there is no "good cause" for filing a sur-reply, and Defendants' motion to do so is **DENIED**.

## B. Motion to Certify

### 1. Rule 23(a)

#### a. Numerosity

■■■■ To prove numerosity, Plaintiffs must demonstrate that the putative class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "There is no strict numerical test for determining impracticability of joinder." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996) (citing *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 523 n. 24 (6th Cir. 1976), *cert. denied*, 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976)). Indeed, "[t]he numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations." *Gen. Tel. Co. of the Nw., Inc., v. EEOC*, 446 U.S. 318, 330, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980). Although "the exact number of class members need not be pleaded or proved, . . . impracticability of joinder must be positively shown, and cannot be speculative." *McGee v. East Ohio Gas Co.*, 200 F.R.D. 382, 389 (S.D. Ohio 2001) (internal quotation marks and citations omitted). "When class size reaches substantial proportions, however, the numerosity requirement is usually satisfied by the number bers alone." *Ross v. Abercrombie & Fitch Co.*, 257 F.R.D. 435, 442 (S.D. Ohio 2009). Notably, "The numerosity requirement is generally assumed to have been met in class action suits involving nationally traded securities." *Id.* (collecting cases).

Here, Plaintiffs state that the exact number of potential Class Members is unknown. However, Defendants admit that Big Lots' stock was traded on the NYSE during the Class Period. Answer ¶ 187, ECF No. 57. Moreover, Plaintiffs submit evidence that the stock had an average daily trading volume in excess of 1.5 million shares and was owned in part by about 450 large institutional investors during the Class Period. Steinholt Rpt. ¶¶ 21, 28, ECF No. 60–3.

The Court finds this evidence sufficient to satisfy Rule 23's numerosity requirement. *See, e.g., Taylor v. CSX Transp., Inc.*, 264 F.R.D. 281, 288 (N.D. Ohio 2007) (finding the numerosity requirement satisfied when the class definition encompassed forty individuals); *Kelly v. Montgomery Lynch & Assocs., Inc.*, No. 1:07–CV–919, 2007 WL 4562913, at *3 (N.D. Ohio Dec. 19, 2007) (finding fifty class members would be sufficient to satisfy the numerosity requirement). Notably, Defendants do not contest Plaintiffs' satisfaction of the numerosity requirement.

#### b. Commonality

■■■■ To prove commonality, Plaintiffs must prove that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50, 131 S.Ct. 2541, 180 L.Ed.2d 374 (quoting *Falcon*, 457 U.S. at 157, 102 S.Ct. 2364). The claims "must depend on a common contention . . . of such a nature that is capable of classwide resolution— which means that determination of its truth or its falsity will resolve an issue that

is central to the validity of each one of the claims in one stroke." *Id.*

■ This case involves common contentions—namely, that Defendants made the same misrepresentations and omissions to the investing public regarding Big Lots' sales results and merchandising operations and that the individual defendants engaged in insider trading. Whether Defendants made certain misrepresentations and omissions, whether such misrepresentations and omissions were material, and whether Defendants acted with the requisite scienter, are all common issues capable of classwide resolution. Indeed, "[q]uestions of misrepresentation, materiality, and scienter are the 'paradigmatic common question[s] of law in a securities fraud class action.'" *Ross*, 257 F.R.D. at 443 (quoting *Bovee v. Coopers & Lybrand*, 216 F.R.D. 596, 609 (S.D. Ohio 2003)). To that end, courts have repeatedly found this requirement satisfied in securities actions. *See, e.g., Schleicher v. Wendt*, 618 F.3d 679, 681 (7th Cir. 2010) (listing common questions in securities-fraud litigation); *Ross*, 257 F.R.D. at 443 (citing cases that have found the requirement "easily" satisfied by the presence of similar common questions).

The Court finds Plaintiffs have satisfied this requirement, and, again, Defendants do not contend otherwise.

### c. Typicality

■ To prove typicality, Plaintiffs must prove that the Class Members' claims are "fairly encompassed by the named plaintiffs' claims." *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998) (en banc) (quoting *In re Am. Med. Sys.*, 75 F.3d at 1082). This requirement ensures that the class representative's interests are aligned with the interests of the class members so that, by pursuing his or her own interests, the class representative also advances the class members' interests. *Id.*

■ A class representative's claim is typical of the class if it "arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *In re Am. Med. Sys.*, 75 F.3d at 1082 (quoting 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions*, § 3.01, at 3–4 (3d ed. 1992)). The class representative's claims need not be factually identical to the class members' claims in order to satisfy the typicality requirement, which is liberally construed. *Senter*, 532 F.2d at 525 n.31.

■ Moreover, "[t]he threshold for satisfying the typicality prong is a low one," *Salvagne v. Fairfield Ford, Inc.*, 264 F.R.D. 321, 328 (S.D. Ohio 2009), and "[i]n instances wherein it is alleged that the defendants engaged in a common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical of the absent members." *In re Catfish Antitrust Litig.*, 826 F.Supp. 1019, 1035 (N.D. Miss. 1993).

The claims asserted by City of Pontiac and Local 237 are typical of the claims of the Class. All of the Class Members' claims are based on the same legal theory—that Defendants violated §§ 10(B), 20(a), and 20A of the Securities Exchange Act of 1934 by making the same misrepresentations and omissions. As is true for the rest of the Class, City of Pontiac and Local 237 each purchased shares of Big Lots' stock during the Class Period, *see* Murray Decl. Ex. B, ECF No. 60–2; Goldberg Decl. Ex. 1, ECF No. 60–6, and both contend they relied on the misrepresentations and omissions through the fraud-on-the-market theory and suffered damages when Big Lots' stock price eventually reflected the truth.

Defendants do not dispute the above but rather argue that typicality is lacking be-

cause City of Pontiac and Local 237, as Class Representatives, are subject to the unique defense of non-reliance on the market.

■■■■ "[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 59 (2nd Cir. 2000) (internal quotation marks and citation omitted). However, unique defenses will destroy typicality only "where the defenses against the named representatives are likely to usurp a significant portion of the litigant's time and energy, and there is a danger that the absent class members will suffer if their representative is preoccupied with defenses unique to it." *Bentley v. Honeywell Intern., Inc.*, 223 F.R.D. 471, 484 (S.D. Ohio 2004) (internal quotation marks and citations omitted).

Defendants contend that, in this case, City of Pontiac and Local 237 utilized investment advisors in making investment decisions such as purchasing Big Lots stock. Defendants further contend that the advisors making the investment decisions for City of Pontiac and Local 237 determined the intrinsic value of Big Lots' stock through their own research and analysis, not through reliance on the market price of Big Lots' stock. City of Pontiac and Local 237's non-reliance on the market, Defendants contend, destroys typicality because class certification in this case relies on the fraud-on-the-market theory of

reliance and the corresponding *Basic* presumption.[2] For support, Defendants cite to *GAMCO Investors, Inc. v. Vivendi, S.A.*, 927 F.Supp.2d 88, 102 (S.D.N.Y. 2013); *In re Vivendi Universal S.A. Securities Litig.*, 123 F.Supp.3d 424, 426–27 (S.D.N.Y. 2015), and *Blank v. Jacobs*, No. 03–CV–2111(JS)(MLO), 2009 WL 3233037, at *5 (E.D.N.Y Sept. 30, 2009) for the proposition that a class representative's reliance on its own assessment of the value of a stock, rather than the market, makes the representative subject to a unique defense and destroys typicality.

Defendants' argument is not well taken. Indeed, "[c]ourts have routinely rejected the argument defendant[s] now advance[ ]." *In re Diamond Foods, Inc., Securities Litig.*, 295 F.R.D. 240, 252 (N.D. Cal. 2013) (citations omitted); *see also id.* at 253 (distinguishing *GAMCO*). The Court in *In re Diamond Foods* stated it bluntly:

> That an investment advisor thinks it is smarter than the rest of the market in evaluating truthful public data in the market should not be a license for manipulators to pump false information into the public domain to grossly inflate a stock price. Most investors think they are a little smarter than average and see opportunities others have missed. Still, they all rely on publicly available data (with the exception, of course, of investors trading on insider information).

*Id.* at 253.

In fact, *Blank* and *GAMCO* were decided prior to the Supreme Court's decision in *Halliburton II*, which stated:

2. The fraud-on-the-market theory underpins a presumption of reliance, recognized by the Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), that is discussed in more detail *infra*. Generally, the *Basic* presumption is a manner in which a court can presume that a class of individuals relied on a defendant's misrepresentations through the class's reliance on the integrity of a stock's market price, which is

presumed to reflect any public misrepresentation made by a defendant. If a class representative did not rely on the integrity of a stock's market price, his or her claim does not rest on the fraud-on-the-market theory, or, consequently, the *Basic* presumption, and his or her claim would thus not be typical of the remainder of the class members' claims in a fraud-on-the-market case.

[T]here is no reason to suppose that even [defendant's] main counterexample—the value investor—is as indifferent to the integrity of market prices as [defendant] suggests. Such an investor implicitly relies on the fact that a stock's market price will eventually reflect material information—how else could the market correction on which his profit depends occur? To be sure, the value investor "does not believe that the market price accurately reflects public information *at the time he transacts." Post,* at 2423. But to indirectly rely on a misstatement in the sense relevant for the *Basic* presumption, he need only trade stock based on the belief that the market price will incorporate public information within a reasonable period. The value investor also presumably tries to estimate *how* undervalued or overvalued a particular stock is, and such estimates can be skewed by a market price tainted by fraud.

*Halliburton Co. v. Erica P. John Fund, Inc.,* —— U.S. ——, 134 S.Ct. 2398, 2411, 189 L.Ed.2d 339 (2014) (*Halliburton II*) (emphasis in original).[3]

*In re Vivendi Universal,* the third case Defendants cite for support, was decided after *Halliburton II,* specifically recognized that *Halliburton II* "rejected" the argument "that value investors are universally indifferent to the integrity of market prices[,]" and noted that "value investors may invoke the *Basic* presumption at the *class certification stage....*" *In re Vivendi Universal,* 123 F.Supp.3d at 433, 437 (emphasis in original).

Though it was ultimately determined that the defendant was able to rebut the *Basic* presumption of reliance in both *GAMCO* and *In re Vivendi Universal,* those cases are factually distinguishable from the allegations made at this stage, in this case. First, neither the *GAMCO* nor *In re Vivendi Universal* decision was made at the class certification stage. Rather, they were both made in the course of post-trial proceedings wherein the defendant attempted to rebut the presumption of reliance with respect to individual plaintiffs. *See GAMCO,* 927 F.Supp.2d at 90; *In re Vivendi Universal,* 123 F.Supp.3d at 425. Second, in *GAMCO,* the defendant showed that the plaintiff would have purchased the security at issue even if it had known of the fraud. *See GAMCO Investors, Inc. v. Vivendi Universal, S.A.,* 838 F.3d 214, 218 (2nd Cir. 2016) (finding the district court did *not* hold that a defendant can rebut the presumption of reliance by simply showing that a plaintiff was a value investor but rather held that the particular plaintiff in that case, GAMCO (who was neither a class representative nor a member in the related class action), would have bought the security even if it had known of the fraud). Likewise, in *In re Vivendi Universal,* the class member testified that he was not misled by the fraud and that the truth would not have mattered to him even if he had known it. *In re Vivendi Universal,* 123 F.Supp.3d at 436. Thus, neither case held, at the class certification stage, that a plaintiff's status as a value investor defeated typicality.

In this case, the Court has reviewed the portions of Robert Benton's ("Benton"), Ronald Mushock's ("Mushock"), Randell Cain's ("Cain"), and Janna Sampson's ("Sampson") depositions that Defendants

---

3. *Blank* is further distinguishable from the case *sub judice* in that, in *Blank,* one of the putative class representatives had relied on inside information from the defendant when it purchased the stock at issue. *Blank,* 2009 WL 3233037, at *5.

*GAMCO* is further distinguishable in that it was not decided in the context of determining typicality for class certification but rather for whether the defendant rebutted the *Basic* presumption of reliance after a trial on the merits. *GAMCO,* 927 F.Supp.2d at 91.

cite for support of their typicality argument.[4] None testified that they were not misled by fraud or that they would have purchased Big Lots' stock even if they had known of the fraud. Accordingly, this case is distinguishable from *GAMCO* and *In re Vivendi Universal.* Defendants offer no cases holding that the mere fact that a class member is a value investor is, alone, enough to defeat *Basic's* presumption of reliance, and the Court has found none. As such, the Court rejects Defendants' argument that typicality is destroyed due to unique non-reliance defenses as to the proposed Class Representatives and instead finds that Plaintiffs have satisfied the typicality requirement.

### d. Adequacy

Courts analyzing Rule 23(a)(4)'s adequacy of representation requirement must consider two criteria: "(1) the representative must have common interests with unnamed members of the class; and (2) it must appear that the representative[ ] will vigorously prosecute the interests of the class though qualified counsel." *Senter,* 532 F.2d at 525 (citing *Gonzales v. Cassidy,* 474 F.2d 67, 73 (5th Cir. 1973)). The first criterion overlaps the typicality and commonality requirements. *In re Am. Med. Sys.,* 75 F.3d at 1083; *see also Ross,* 257 F.R.D. at 447 ("The first requirement . . . acts to ensure that the representatives have interests co-extensive with, rather than antagonistic to, the interests of the other class members." (citation omitted)).

The second criterion "raises concerns about the competency of class counsel." *Falcon,* 457 U.S. at 157 n. 13, 102 S.Ct. 2364. "Plaintiff must have sufficient financial and personal involvement to encourage it to prosecute the action vigorously, and adequate resources and legal

representation to meet the demands of maintaining the action. Further, class counsel must be qualified, experienced, and generally able to conduct the litigation." *Ross,* 257 F.R.D. at 450 (citations omitted). A court may deny certification when the class representatives have "so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." *Bovee,* 216 F.R.D. at 615 (citations omitted).

City of Pontiac and Local 237 contend, and the Court agrees, that they will fairly and adequately protect the interests of the Class. Turning to the first criterion, City of Pontiac's and Local 237's interests align with the interests of the rest of the Class. As mentioned above, both parties purchased Big Lots' stock during the Class Period, when it is alleged that the prices were inflated due to Defendants' misrepresentations and omissions, and, like the rest of the Class, both parties allegedly sustained damages when the price of stock fell after the truth came to light. Moore Decl. ¶ 6, ECF No. 60–5; Murray Decl. Ex. 1, ECF No. 60–2; Goldberg Decl. ¶ 4 & Sch. A, ECF No. 60–6.

Defendants disagree and argue that City of Pontiac cannot represent plaintiffs who bought stock after April 23, 2012. Defendants state that City of Pontiac sold the last of its Big Lots stock on August 17, 2012, and argue that, therefore, City of Pontiac suffered no loss following the August 23, 2012, corrective disclosure. Defendants contend City of Pontiac not only lacks incentive to demonstrate inflation between April 23, 2012, and August 23, 2012, but actually has an incentive to minimize such inflation in order to recover greater damages for itself in connection with the

---

4. Benton, Mushock, Cain, and Sampson were the 30(b)(6) representatives from the investment advisors to City of Pontiac and Local 237.

April 23 corrective disclosure. Accordingly, Defendants assert, City of Pontiac's interests are antagonistic to the interests of the Class members who purchased stock after April 23, 2012.

"This argument regarding potential interclass conflict has been rejected by the majority of judges...." *In re Diamond Foods, Inc.*, 295 F.R.D. at 254 (citations omitted). "Courts have ... repeatedly recognized that putative intra-class conflicts relating to the times at which particular class members purchased their securities, and which could potentially motivate different class members to argue that the securities were relatively more or less inflated at different time periods, relate to damages and do not warrant denial of class certification." *Id.* (internal quotation marks and citations omitted); *see also Thorpe v. Walter Inv. Mgmt., Corp.*, No. 1:14–cv–20880–UU, 2016 WL 4006661, at *9 (S.D. Fla. Mar. 16, 2016) ("The substantial majority of courts that have addressed the propriety of class certification based on the timing of the class representative's sales or purchases have found, however, that the timing of the transactions does not necessarily create fundamentally divergent interests with the putative class. Rather, the supposed intra-class conflict based on the timing at which stock positions were divested or acquired is principally a damages issue, which is an inquiry premature at the class certification stage." (collecting cases)); *Bovee,* 216 F.R.D. at 610 ("[T]he traditional rule is that a plaintiff class should be certified despite conflicts over damages issues between early and late sellers of stock." (internal quotation marks and citations omitted)). The Court finds that all of the Class Members have an interest in proving that Big Lots' stock was artificially inflated during the Class Period and therefore finds that City of Pontiac's interest is not antagonistic to the Class Members who purchased stock after April 23, 2012.

Turning to the second criterion, City of Pontiac and Local 237 have sufficient financial and personal involvement to encourage them to prosecute the action vigorously and have adequate resources and legal representation to meet the demands of maintaining the action. Specifically, the Court finds City of Pontiac and Local 237 have significant financial incentive to achieve the best results possible for the Class due to their significant investment, and substantial losses, in Big Lots' stock during the Class Period. *See* Murray Decl. Ex. 1, ECF No. 60–2; Moore Dep. 121:19–20, ECF No. 74–1; Goldberg Decl. Sch. A, ECF No. 60–6. Moreover, City of Pontiac has been adequately representing the putative Class since its appointment as lead plaintiff. Since that appointment, City of Pontiac, through counsel, filed an eighty-three page Amended Complaint and partially succeeded in defending against a motion to dismiss. Am. Compl., ECF No. 18, Opinion and Order, ECF No. 49.

Moreover, both City of Pontiac and Local 237 have committed to actively directing this litigation by attending hearings, depositions, and/or trial, and by overseeing the preparation of pleadings. Murray Decl. ¶ 8, ECF No. 60–5; Goldberg Decl. ¶ 6, ECF No. 60–6. Walter Moore ("Moore"), Chairman of City of Pontiac's Board of Trustees, testified that City of Pontiac receives monthly reports on the case and personally reviewed the complaint, responses to the complaint, requests for documentation, and requests for interrogatories. Moore Dep. 85: 2–9, 95:2–8, ECF No. 74–1. Mitch Goldberg ("Goldberg"), Director of Local 237, testified that he reviewed "all the documents," including the complaint, the Court's Opinion and Order on Defendants' motion to dismiss, and all of the motions and rulings made until his deposition. Goldberg Dep. 27:4–28:4, ECF No. 74–4. City of Pontiac and Local 237 participated in responding to documents

requests and interrogatories from Defendants. Moore Dep. 35:23–36:10, ECF No. 74–1, Goldberg Dep. 38:3–19, 42:22–43:19, ECF No. 74–4. Moreover, both City of Pontiac and Local 237 have recognized their fiduciary duty as Class Representatives and have pledged to protect the best interests of the Class by "obtain[ing] the largest recovery for the class consistent with good faith and meritorious advocacy." Moore Decl. ¶ 7–8, ECF No. 60–5; Goldberg Decl. ¶ 5, ECF No. 60–6.

 Defendants contend that City of Pontiac and Local 237 lack the requisite knowledge about the case and have failed, and will fail, to direct the litigation. Defendants cite portions of Moore's deposition, wherein he testified generally to City of Pontiac's process of determining whether to become involved in litigation, and fault Moore for failing to identify specific materials that formed the basis for City of Pontiac's decision to participate in this litigation. Moore Dep. 73:7–11, 86:12–19; 120:24–121:6, ECF No. 74–1. However, Moore was testifying as a corporate representative, and he testified that the general practice was for the board to consider a presentation by local counsel and then to vote on whether to become involved. Moore, however, was not personally present at the meeting at which City of Pontiac's board voted to become involved in this litigation. Id. at 73:18–75:5, 77:14–80:3, 86:6–10. Nonetheless, he testified to a basic understanding of the case, as did Goldberg on behalf of Local 237. Id. at 121:7–122:21; Goldberg Dep. 88:19–89:19, ECF No. 74–4. That is all that is required. W. Palm Beach Police Pension Fund v. DFC Glob. Corp., No. CN 13–6731, 2016 WL 4138613, at *10 (E.D. Pa. Aug. 4, 2016). As this Court has recognized:

> [I]n securities cases ... where the class is represented by competent and zealous counsel, class certification should not be denied simply because of a perceived

lack of subjective interest on the part of the named plaintiffs unless their participation is so minimal that they virtually have abdicated to their attorneys the conduct of the case. To require less would permit attorneys essentially to serve as class representatives; to require more could well prevent the vindication of the legal rights of the absent class members under the guise of protecting those rights.

Bovee, 216 F.R.D. at 615 (quoting Kirkpatrick v. J.C. Bradford & Co., 827 F.2d 718, 727 (11th Cir. 1987)). The Court is satisfied that City of Pontiac and Local 237 have the requisite knowledge about the case to serve as adequate representatives.

Further, there can be no serious dispute that Robbins Geller is qualified, experienced, and generally able to conduct the litigation. As noted in the Court's Opinion and Order appointing Robbins Geller as lead counsel, the firm secured the largest recovery to date in a shareholder class action while serving as lead counsel in In re Enron Corp. Securities Litigation, 2005 WL 3504860, 2005 U.S. Dist. LEXIS 39867 (S.D. Tex. Dec. 22, 2005). Opinion and Order 9, ECF No. 17. Defendants do not question Robbins Geller's ability to conduct the litigation.

Nonetheless, Defendants offer a slew of additional arguments as to why City of Pontiac and Local 237 are inadequate representatives, none of which have merit. First, the fact that Moore testified that City of Pontiac leaves the litigation strategy to counsel does not render City of Pontiac an inadequate representative. See Bovee, 216 F.R.D. at 616 (finding named representative could rely on the expertise of counsel). Nor does the fact that City of Pontiac and Local 237 learned of this case through a monitoring agreement render them inadequate to serve as Class Representatives. Plumbers & Pipefitters Nat.

*Pension Fund v. Burns,* 292 F.R.D. 515, 523 (N.D. Ohio 2013) ("Courts have routinely rejected attacks on the propriety of portfolio monitoring agreements...." (citations omitted)).

Defendants further contend that Local 237's representative, Goldberg, improperly changed his deposition testimony after conferring with counsel and that, therefore, Local 237 is an inadequate Class Representative. Defendants assert that Goldberg's "shifting testimony following what appears to have been improper coaching by Robbins Geller will be the subject of discovery and cross-examination at trial by the Defendants." Resp. 33, ECF No. 74. They argue that the inquiry into this alleged improper conduct will detract from the substantive allegations in the case and will prejudice absent Class Members, citing two nonbinding district court cases for the proposition that such conduct renders Local 237 inadequate. *Id.* at 34 (citing *Rocco v. Nam Tai Elecs., Inc.,* 245 F.R.D. 131, 136–37 (S.D.N.Y. 2007); *Kline v. Wolf,* 88 F.R.D. 696, 700 (S.D.N.Y. 1981)).

Those cases are distinguishable. In *Kline,* the proposed representatives were subject to unique defenses regarding their reliance on the market, 88 F.R.D. at 698–99, and it was one proposed representative's refusal to answer questions regarding her reliance (i.e., a "failure to comply with [a] proper discovery inquiry") that the court stated it could consider in determining whether she would live up to her fiduciary obligation as a representative. *Id.* at 700. In *Rocco,* the putative named representative was determined to be inadequate because he, *inter alia,* delayed discovery by four months. *Rocco,* 245 F.R.D. at 133 n.1, 136–37.

Here, the "shifting" deposition testimony referenced by Defendants relates to Local 237's knowledge of the case, which is relevant only for purposes of satisfying the adequacy requirement during class certification. Goldberg's challenged testimony did not relate to the merits of the underlying litigation at all, and, needless to say, did not involve any issues, such as reliance, that could lead to a unique defense to the merits of Local 237's claims. Goldberg Dep. 72:25–73:23, 161:9–186:6, ECF No. 74–4. The Court has already found that Local 237 possesses the requisite knowledge of the case to serve as an adequate representative. Accordingly, the Court finds unpersuasive Defendants' argument that Goldberg's "shifting testimony" will be the subject of extended discovery or cross-examination at trial such that it will detract from the substantive allegations in the case.

For the reasons addressed above, the Court finds City of Pontiac and Local 237 are adequate Class Representatives.

### e. Conclusion

The Court finds that Plaintiffs have satisfied the Rule 23(a) criteria for class certification. Accordingly, the Court next considers whether Plaintiffs have satisfied a Rule 23(b) criterion.

### 2. Rule 23(b)

Plaintiffs seek certification pursuant to Rule 23(b)(3), which requires a showing that common questions of fact or law predominate over any individual questions and that a class action is superior to other available methods for adjudicating the controversy. Fed. R. Civ. P. 23(b)(3).

### a. Predominance

"To meet the predominance requirement, a plaintiff must establish that issues subject to generalized proof and applicable to the class as a whole predominate over those issues that are subject to only individualized proof." *Randleman v. Fidelity Nat'l Title Ins. Co.,* 646 F.3d 347, 353 (6th Cir. 2011) (citation omitted). "Considering whether 'questions of law or fact

common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 131 S.Ct. 2179, 2184, 180 L.Ed.2d 24 (2011) ("*Halliburton I*") (quoting Fed. R. Civ. P. 23(b)(3)). "The elements of a private securities fraud claim based on violations of § 10(b) and Rule 10b–5 are: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id.* (internal quotation marks and citations omitted). Despite the many common issues identified above as part of the Rule 23(a) analysis, Defendants contend, as do many defendants in securities actions, that the elements of reliance and damages preclude certification in this case as individual inquiries will predominate over any common issues. The Court addresses these arguments in reverse order.

### i. Classwide Damages

■ Defendants, citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013), argue that Plaintiffs cannot establish predominance because their expert, Mr. Steinholt, failed to advance a methodology for calculating damages on a classwide basis in a manner that is consistent with their theory of liability and the Court's earlier ruling on Defendants' motion to dismiss.

As Plaintiffs advance a methodology for calculating damages on a classwide basis, they must show that the methodology is consistent with their theory of liability. *Comcast*, 133 S.Ct. at 1433.

Plaintiffs have satisfied *Comcast.* Specifically, Mr. Steinholt proposes to use an event study to calculate damages on a classwide basis. For the reasons stated in the Court's Opinion and Order denying Defendants' *Daubert* motion, the Court finds that the proffered methodology is consistent with Plaintiffs' theory of liability and survives a *Daubert* attack.[5] *See also In re VHS of Mich., Inc.*, 601 Fed.Appx. 342, 344 (6th Cir. 2015) ("*Comcast* applies where multiple theories of liability exist, those theories create separable anticompetitive effects, and the combined effects can result in aggregated damages.... Where there is no chance of aggregated damages attributable to rejected liability theories, the Supreme Court's concerns do not apply."). Accordingly, the Court finds that individual damages issues will not predominate over common issues in this case.

### ii. Reliance

■ Defendants also argue that individual issues of reliance on Defendants' alleged misrepresentations will predominate over common issues.

■ "The reliance element [of a § 10(b) and Rule 10b–5 securities fraud claim] 'ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury.'" *Halliburton II*, 134 S.Ct. at 2407 (quoting *Amgen Inc. v. Conn. Retirement Plans and Trust Funds*, 568 U.S. 455, 133 S.Ct. 1184, 1192, 185 L.Ed.2d 308 (2013)). "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction ... based on that specific misrepresentation." *Halliburton I*, 563 U.S. at 810, 131 S.Ct. 2179. But, in *Basic*

---

5. The cases Defendants cite on this point are inapposite, and other courts nave held that event studies such as the one proposed by Mr. Steinholt are acceptable for calculating damages on a classwide basis in securities litigation. *See, e.g., Hatamian v. Advanced Micro Devices, Inc.*, No. 14–CV–226 YGR, 2016 WL 1042502, at *9 (N.D. Cal. Mar. 16, 2016).

*v. Levinson,* the Supreme Court "recognized that requiring such direct proof of reliance would place an unnecessarily unrealistic evidentiary burden on the Rule 10b–5 plaintiff who has traded on an impersonal market" because, even if the plaintiff could show that he was aware of the misrepresentation, he would have to "show a speculative state of facts, *i.e.,* how he would have acted … if the misrepresentation had not been made." *Halliburton II,* 134 S.Ct. at 2407 (citing *Basic,* 485 U.S. at 245, 108 S.Ct. 978 (1988)). The Supreme Court also recognized that such a requirement would essentially prevent security fraud cases from proceeding as class actions because if every plaintiff had to prove direct reliance on a defendant's misrepresentation, individual issues of reliance would predominate over common issues, preventing class certification. *Id.* at 2408 (citing *Basic,* 485 U.S. at 242, 108 S.Ct. 978).

■ "To address those concerns, *Basic* held that securities fraud plaintiffs can in certain circumstances satisfy the reliance element of a Rule 10b–5 action by invoking a rebuttable presumption of reliance, rather than proving direct reliance on a misrepresentation." *Id.* This rebuttable presumption was based on the "fraud-on-the-market" theory, "which holds that 'the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations.'" *Id.* (quoting *Basic,* 485 U.S. at 246, 108 S.Ct. 978). The presumption is that:

> [a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations … may be pre-

sumed for purposes of a Rule 10b–5 action.

*Basic,* 485 U.S. at 247, 108 S.Ct. 978.

■ To invoke the *Basic* presumption, "a plaintiff must prove that: (1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed." *Halliburton II,* 134 S.Ct. at 2413 (citing *Basic,* 485 U.S. at 248, 108 S.Ct. 978; *Amgen,* 133 S.Ct. at 1198).

■ The presumption is rebuttable, however, and a defendant may rebut the presumption of reliance with "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." *Basic,* 485 U.S. at 248, 108 S.Ct. 978. For example, a defendant could rebut the presumption with evidence that "the misrepresentation did not, for whatever reason, actually affect the market price, or that the plaintiff would have bought or sold the stock even had he been aware that the stock's price was tainted by fraud." *Halliburton II,* 134 S.Ct. at 2408.

In this case, Plaintiffs invoke *Basic's* presumption of reliance in order to demonstrate that common issues of reliance predominate over individual issues. Defendants argue that Plaintiffs fail to show the market in which Big Lots' stock traded was efficient, which prevents invocation of the *Basic* presumption of reliance. Further, Defendants contend that even if Plaintiffs can invoke the *Basic* presumption, Defendants have rebutted that presumption.

Without the *Basic* presumption of reliance, each plaintiff would have to show direct reliance, individual issues of reliance

would predominate over common issues, and class certification would be improper. Thus, the first issue is whether Plaintiffs can invoke *Basic's* presumption of reliance, which, in this case, hinges on whether the market in which Big Lots' stock traded was efficient.

In evaluating whether the market in which a security traded was efficient, many courts, including courts in this circuit, look for the following five factors, first set forth in *Cammer v. Bloom,* 711 F.Supp. 1264 (D.N.J. 1989): (1) a large weekly trading volume; (2) the existence of a significant number of reports by securities analysts; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S-3 Registration Statement; and (5) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases. *See Freeman v. Laventhol & Horwath,* 915 F.2d 193, 199 (6th Cir. 1990). Further, the Sixth Circuit has stated that "securities traded in national secondary markets such as the New York Stock Exchange ... are well suited for application of the fraud on the market theory." *Freeman,* 915 F.2d at 199 ("The high level of trading activity ensures that information from many sources is disseminated into the marketplace and consequently is reflected in the market price. This is the premise upon which the fraud on the market theory rests.").

Defendants do not contest that Big Lots' stock traded on the NYSE or that Plaintiffs have proved the first four *Cammer* factors, and the Court finds those factors easily met.

Specifically, with respect to the first factor, during the Class Period, Big Lots' common stock had a reported average weekly trading volume of 7.4 million shares. Steinholt Rpt. ¶ 22, ECF No. 60-3; *Id.* at Ex. B. This amounted to a weekly turnover of over 11% of its outstanding

shares, *id.* which well exceeds the 2% benchmark justifying a "strong presumption" of efficiency, which was referenced in *Cammer. See,* 711 F.Supp. 1264 at 1286 (citing Bromberg & Lowenfels, *4 Securities Fraud and Commodities Fraud,* § 8.6 (Aug. 1988)); *see also Plumbers & Pipefitters Nat'l Pension Fund v. Burns,* 967 F.Supp.2d 1143, 1149 (N.D. Ohio 2013) ("An average weekly trading volume of two percent or more of outstanding shares triggers a 'strong presumption' of market efficiency...." (quoting *Cammer,* 711 F.Supp. at 1286)).

With respect to the second factor, "at least 16 different brokerage firms covered and provided investment recommendations on Big Lots during the Class Period." Steinholt Rpt. ¶ 24; ECF No. 60-3; *Id.* at Ex. C. Similar analyst coverage has been found indicative of market efficiency in this circuit. *See, e.g., Burns,* 967 F.Supp.2d at 1162 (finding fifteen analysts sufficient to support a finding of market efficiency).

The third *Cammer* factor considers the number of market makers and arbitrageurs. *See,* 711 F.Supp. at 1286. Transactions on the NYSE, such as those involving Big Lots' stock, go through a designated market maker ("DMM"), Steinholt Rpt. ¶ 27, ECF No. 60-3, which has been found to satisfy this factor. *Vinh Nguyen v. Radient Pharms. Corp.,* 287 F.R.D. 563, 573 (C.D. Cal. 2012). In addition, there were twelve supplemental liquidity providers for Big Lots' common stock with a volume in excess of one million shares from March 2012 through August 2012. Steinholt Rpt. ¶ 27 n.28, ECF No. 60-3. The Court finds that the DMM and supplemental liquidity providers satisfy this factor. *See Hayes v. MagnaChip Semiconductor Corp.,* No. 14-cv-01160-JST, 2016 WL 7406418, at *6 (N.D. Cal. Dec. 22, 2016).

With respect to the fourth *Cammer* factor, Big Lots was eligible to file a Form S–

3 Registration Statement for the entire Class Period, meaning it was an SEC reporting company for at least twelve months and had an average of $75 million in voting stock held by non-affiliates during the sixty-day period prior to filing. Steinholt Rpt. ¶ 30, ECF No. 60-3.

Thus, the first four *Cammer* factors are satisfied in this case. Defendants contend, however, that the first four factors are mere prerequisites for a finding of efficiency. Defendants assert that Plaintiffs cannot prove that a certain stock traded efficiently without proof of the fifth factor, a history of immediate movement of the stock price caused by unexpected corporate events or financial releases, and that Plaintiffs fail to prove the fifth factor in this case.

Plaintiffs reject the notion that they must prove the fifth *Cammer* factor in order to show market efficiency, arguing that Defendants' position effectively renders the first four factors meaningless and turns the fifth factor from a "factor" into a "requirement."

The Court need not resolve this dispute because Plaintiffs have satisfied the fifth *Cammer* factor in this case. Steinholt performed an event study in this case. To do so, he used a regression analysis to determine the statistical relationship between Big Lots' stock price returns and the returns on market and/or industry indices during a control period. Steinholt Rpt. ¶ 32, ECF No. 60-3. He then compared the actual stock price return on each event day [6] to the return predicted by the regression to determine any excess return ("the stock's return on the event day net of market and industry factors"). *Id.* The excess return determines the p-value, "the probability of an equal or greater absolute return occurring randomly. A price move-

ment with a p-value of 5% or less is defined as being statistically significant at the 5% level." *Id.*

Steinholt's event study showed that five out of the six financial releases were followed by statistically significant price movements at the 5% level. *Id.* ¶ 37. Steinholt reported that "[t]he cumulative probability of five or more days out of six being statistically significant at the 5% level simply by chance is less than one in more than half a million." *Id.* From this event study, Steinholt opined that there was a cause and effect relationship between financial releases and an immediate response in stock price. *Id.* ¶¶ 37–38.

Defendants attack Steinholt's event study, arguing that it was scientifically unreliable due to Steinholt's failure to perform an *ex-ante* hypothesis for the events he tested and because Steinholt included the corrective disclosure dates in the event study, which, Defendants contend, biased the study's results. These arguments mirror the arguments Defendants made in their *Daubert* motion and are rejected for the same reasons stated in the Court's Opinion and Order denying that *Daubert* motion. Accordingly, the Court finds Steinholt's event study is acceptable proof of *Cammer* factor five as it is empirical evidence of a cause and effect relationship between Big Lots' financial releases and an immediate response in Big Lots' stock price.

In sum, the Court finds that all of the *Cammer* factors weigh in favor of finding market efficiency. Therefore, Plaintiffs can invoke *Basic's* presumption of reliance.

■ Defendants, however, contend that even if Plaintiffs can invoke *Basic's* presumption of reliance, Defendants can

---

**6.** Steinholt analyzed six event days in 2012, the days on which Big Lots issued financial

releases that year. *Id.* ¶ 33.

successfully rebut that presumption with evidence of a lack of price impact (i.e., that the misrepresentation did not affect the stock price).

The *Basic* presumption:

actually incorporates two constituent presumptions: First, if a plaintiff shows that the defendant's misrepresentation was public and material and that the stock traded in a generally efficient market, he is entitled to a presumption that the misrepresentation affected the stock price. Second, if the plaintiff also shows that he purchased the stock at the market price during the relevant period, he is entitled to a further presumption that he purchased the stock in reliance on the defendant's misrepresentation.

*Halliburton II*, 134 S.Ct. at 2414. Thus, "*Basic* allows plaintiffs to establish [price impact] indirectly." *Id.* at 2416.

 Because a lack of price impact would defeat "the basis for finding that the fraud had been transmitted through market price," a lack of price impact would necessarily defeat a plaintiff's ability to invoke *Basic's* presumption of reliance. *Id.* at 2415–16 (internal quotation marks and citation omitted). As discussed above, without the presumption of reliance, "[e]ach plaintiff would have to prove reliance individually, so common issues would not 'predominate' over individual ones, as required by Rule 23(b)(3)." *Id.* at 2416. Thus, price impact is "an essential precondition for any Rule 10b–5 class action." *Id.* at 2416. A defendant can thus defeat the presumption of reliance at the class certification stage with evidence of a lack of price impact. *Id.* at 2414–15.

Defendants assert that there are two ways of proving a lack of price impact: (1) by showing that the alleged misrepresen-

tations did not cause a stock price to increase (what Defendants refer to as "front-end price impact"), or (2) by showing that the alleged corrective disclosure did not cause the stock price to decrease (what Defendants refer to as "back-end price impact"). Resp. 22, ECF No. 74 (citing *Halliburton II*, 134 S.Ct. at 2414). Here, Defendants attempt to show that the alleged misrepresentations did not cause Big Lots' stock price to increase in a statistically significant manner.[7]

Defendants are correct in arguing that Steinholt's regression analysis does not show a statistically significant price increase associated with any of the nine alleged misrepresentation dates. Steinholt Rpt. Ex. E, ECF No. 60–3. However, the Court does not agree with Defendants' reading of *Halliburton II* as to the manners in which they may show a lack of price impact or with the cases Defendants cite in support of their argument. Namely, to the extent Defendants attempt to distinguish between price impact and loss causation temporally—that price impact is the movement in a stock's price at the time a misrepresentation is made and loss causation is the drop in price after a corrective disclosure—the Court disagrees with that distinction.

 Price impact is the consideration of "whether the alleged misrepresentations affected the market price in the first place." *Halliburton I*, 563 U.S. at 814, 131 S.Ct. 2179 (citations to the docket omitted). The Court does not read *Halliburton I or II* as holding that the price of a stock must rise after a misrepresentation in order for the misrepresentation to affect the stock price. Rather, the price maintenance theory—the theory that a misrepre-

---

7. Defendants' expert, Dr. Paul Gompers ("Gompers"), did not provide any affirmative opinion of his own regarding price impact. Gompers Dep. 212:6–213:2, ECF No. 78–2.

Rather, his opinion on price impact was solely that Steinholt's regression analysis does not prove that the misrepresentations caused price inflation.

sentation can have a price impact not only by raising a stock's price but also by maintaining a stock's already artificially inflated price—is consistent with the Supreme Court's discussion of price impact. Accordingly, price impact is demonstrated either through evidence that a stock's price rose in a statistically significant manner after a misrepresentation or that it declined in a statistically significant manner after a corrective disclosure.[8] *See Halliburton II*, 134 S.Ct. at 2414 (a defendant can rebut the presumption of price impact with "evidence that the misrepresentation (or its correction) did not affect the market price of the defendant's stock").

Loss causation, on the other hand, is the showing "that the defendant's deceptive conduct caused [the plaintiffs] claimed economic loss." *Halliburton I*, 563 U.S. at 807, 131 S.Ct. 2179. In other words, loss causation is the showing that the price impact was caused by "the correction to a prior misleading statement and that the subsequent loss could not otherwise be explained by some additional factors revealed then to the market." *Id.* at 812, 131 S.Ct. 2179, 2184 (internal quotation marks and citations omitted).

Therefore, to successfully rebut the *Basic* presumption, a defendant cannot simply show that a price did not rise after a misrepresentation.

With respect to the price maintenance theory, Defendants do not contest that Steinholt's regression analysis shows a statistically significant price decrease associated with the corrective disclosure dates. Steinholt Rpt. ¶¶ 41, 44 (stating that decrease in Big Lots' stock price following the corrective disclosures on April 23, 2012, and August 23, 2012, was statistically

significant at the 1 % level); *Id.* at Ex. E, ECF No. 60–3. Moreover, Dr. Gompers testified that there are several types of analyses that could demonstrate price impact under the price maintenance theory and that Steinholt's analysis could not conclusively demonstrate whether there was price impact under that theory. Gompers Dep. 219: 16–222:7, ECF No. 78–2. Yet, Dr. Gompers failed to conduct such analyses to affirmatively determine whether there was price impact under the price maintenance theory.

Rather than proving that there was no price impact under the price maintenance theory, Defendants urge the Court to reject the price maintenance theory altogether. Defendants primarily cite *IBEW Local 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 782 (8th Cir. 2016) for support. In that case, however, instead of putting the onus on the defendants to show a lack of price impact under the price maintenance theory, the Eighth Circuit first determined that the misrepresentations did not cause the stock's price to rise (which the court concluded was evidence of no price impact) and then put the burden on the plaintiffs to show that the price maintenance theory rebutted that evidence of no price impact. *Id.* at 782–83. That analysis flips the burden onto plaintiffs to prove price impact under their advanced theory when the burden should rest on a defendant to prove lack of price impact in order to rebut *Basic's* presumption at this stage, *see Halliburton II*, 134 S.Ct. at 2417 (Ginsburg, Breyer, Sotomayor, JJ., concurring) ("[T]he Court recognizes that it is incumbent upon the defendant to show the absence of price impact.").

---

**8.** Indeed, Defendants' expert, Dr. Gompers, stated in his report that demonstrating that the alleged misstatements caused a positive and statistically significant price increase was only one "possible way for Mr. Steinholt to show that inflation was created...." Gompers Rpt. ¶ 13, ECF No. 75–9. Dr. Gompers recognized that Steinholt actually invoked the price maintenance theory. *Id.*; Gompers Dep. 218:23–219:14, ECF No. 78–2.

The other cases cited by Defendants are inapposite. For example, in *City of Sterling Heights General Employees' Retirement System v. Prudential Financial, Inc.*, 2015 WL 5097883 (D.N.J. Aug. 31, 2015), the defendants attempted to rebut the *Basic* presumption by arguing there was no evidence of loss causation, which the court held was a merits determination not applicable at the class certification stage. *Id.* at *11. Moreover, that court actually held that a lack of price movement following fourteen alleged misrepresentations did not defeat the presumption where those misrepresentations repeated misrepresentations that did increase the stock price, implicitly accepting the inflation-maintenance theory. *Id.* at *12 n.8 ("[I]t also does not necessarily follow from the mere absence of a statistically significant change in the stock price that there was no price impact. It is possible that those statements assisted in maintaining an inflated price for Prudential's stock—a possibility that Defendants do not rule out.") In *In re Moody's Corp. Securities Litigation*, the court found the defendants rebutted the presumption of reliance by showing *both* that the misrepresentations were not associated with a price increase *and* that there was no corrective disclosure date associated with a price decline that could "prov[e] a link between the misrepresentation and the price for the class as Plaintiffs seek to define it." 274 F.R.D. 480, 493 (S.D.N.Y. 2011). That conclusion is consistent with this Court's analysis above.

It appears the United States Court of Appeals for the Sixth Circuit has not considered the price maintenance theory of price impact. However, the price maintenance theory has been accepted as cognizable by at least three circuits. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2nd Cir. 2016) ("[I]t is hardly illogical or inconsistent with precedent to find that a statement may cause inflation not simply by *adding* it to a stock, but by maintaining it."); *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1314 (11th Cir. 2011) ("[C]onfirmatory information that wrongfully *prolongs* a period of inflation—even without increasing the *level* of inflation—may be actionable under the securities laws."); *Schleicher*, 618 F.3d at 683–84.

Moreover, at least one district court in this circuit has accepted the price maintenance theory. *See Burges v. Bancorpsouth, Inc.*, 2016 WL 1701956, at *3, 2016 U.S. Dist. LEXIS 56802, at *8–9 (M.D. Tenn. Apr. 28, 2016) ("*Halliburton* says only that defendants may present evidence that the misrepresentation did not in fact affect the stock price, not that the price impact is determined only at the time of the alleged misrepresentations."), *vacated on other grounds, In re BancorpSouth, Inc.*, 2016 WL 5714755, 2016 U.S. App. LEXIS 16936 (6th Cir. 2016).

This Court agrees with the reasoning of those courts that have recognized the price maintenance theory of price impact. The court in *Hatamian v. Advanced Micro Devices, Inc.*, 2016 WL 1042502 (N.D. Cal. Mar. 16, 2016), aptly characterized and rejected Defendants' position when it said:

Defendants essentially invite the Court to focus exclusively on price impact at the time of a misrepresentation, ignoring price impact at the time of a corrective disclosure. Price impact in securities fraud cases is not measured solely by price increase on the date of a misstatement; it can be quantified by decline in price when the truth is revealed. This is because lack of a statistically significant price increase does not necessarily equate to lack of price impact. As Professor Coffman explains, a misrepresentation may not cause a statistically significant change in price because misstatements are not made in a vacuum and other information can offset or

confound the effects of a particular misrepresentation. It is also possible that "a misstatement could serve to maintain the stock price at an artificially inflated level without also causing the price to increase further. Thus, Defendants' evidence that there was no statistically significant price impact on certain misstatement dates cannot alone persuade where, as here, expert reports show statistically significant price impacts on each disclosure date."

*See*, 2016 WL 1042502, at *7 (citations omitted).

In sum, the Court rejects the notion that a defendant can rebut *Basic's* presumption of price impact solely by showing that there was no statistically significant price increase after a misrepresentation was made. Defendants failed to show that there was no statistically significant price impact following the corrective disclosures in this case. Accordingly, Defendants have failed to rebut the presumption of reliance, individual issues of reliance will not predominate over common issues, and the predominance requirement of Rule 23(b)(3) is satisfied.

### b. Superiority

■ Finally, before certifying a class under Rule 23(b)(3), the Court must find that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). To make this decision, the Court considers: (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action. *Id.*

■ Defendants do not contest that a class action is a superior method for adjudicating this case, and the Court finds this requirement satisfied. The Class Members have little interest in individually controlling separate actions as the amount of individual damages is likely to be small. "[S]mall awards weigh in favor of class suits." *Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*, 654 F.3d 618, 630 (6th Cir. 2011) (citing *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 567 (6th Cir. 2007)). The Court is not aware of any litigation concerning this controversy that has already begun by or against the Class Members. Concentrating litigation of the claims in this forum is desirable as the Undersigned is also handling the corresponding shareholder derivative suit. Last, the difficulties in managing a class action do not outweigh the benefits of certifying a class in this case.

■ "It is well-recognized that class actions are a particularly appropriate means for resolving securities fraud actions," *Ross*, 257 F.R.D. at 455 (internal quotation marks and citations omitted), and, here, class action is clearly the superior method of adjudicating this case.

### C. Motion to Appoint Class Counsel

■ "When one applicant seeks appointment as class counsel, the court may appoint that applicant only if the applicant is adequate under [Federal Rule of Civil Procedure] 23(g)(1) and (4)." Fed. R. Civ. P. 23(g)(2). Rule 23(g)(1) requires the Court, in appointing class counsel, to consider: (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A). Rule 23(g)(1) also lists other

matters the Court may consider and actions the Court may take in appointing Class Counsel. Fed. R. Civ. P. 23(g)(1)(B)–(E). Rule 23(g)(4) requires Class Counsel to "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4).

In this case, Robbins Geller has done significant work in identifying and investigating the potential claims in the action, as evidenced by its filing as Lead Counsel of an eighty-page Amended Complaint, ECF No. 18, that partially survived Defendants' motion to dismiss, ECF No. 49. Counsel's experience in handling class actions was discussed previously by the Court in the Order appointing Robbins Geller as Lead Counsel, ECF No. 17. To say the least, Robbins Geller has extensive experience in handling class actions. Counsel's Amended Complaint and briefing on both Plaintiffs' motion for class certification and Defendants' *Daubert* motion demonstrate its knowledge of the applicable law. The Court has no reason to believe Robbins Geller will be unable to commit the resources necessary to represent the Class or will fail to fairly and adequately represent the interests of the Class.

Accordingly, pursuant to Rule 23(g), the Court **APPOINTS** Robbins Geller as Class Counsel.

## IV. CONCLUSION

For the foregoing reasons, the Court finds that Plaintiffs have established the requirements for class certification under Rule 23(a) and 23(b)(3). Accordingly, Plaintiffs' motion for class certification is **GRANTED.** The Court **CERTIFIES** the following Class:

> All persons who purchased the common stock of Big Lots, Inc. between March 2, 2012 and August 23, 2012, and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, members of

their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

Moreover, City of Pontiac and Local 237 are **APPOINTED** as Class Representatives, and Robbins Geller is **APPOINTED** as Class Counsel.

Within **TWENTY–ONE DAYS** of the date of entry of this Opinion and Order, the parties shall submit an agreed-upon form of notice, a joint proposal for dissemination of the notice, and the timeline for opting out of the action. Plaintiffs must bear the costs of the notice, which shall include mailing by first-class mail.

Finally, counsel for both sides are **ADVISED** that citations in all further briefing must include a reference to the ECF entry where the exhibit can be found. Such reference shall appear in the citations throughout the brief, not simply in a table at the front of the brief.

The Court wasted valuable time searching for the exhibits referenced in the briefing during the course of ruling on these motions. For example, the Court had to flip between the substantive brief and the "citation conventions" or "appendix of defined terms," at the beginning of each brief, where they existed, every time an exhibit was cited in the more than 230 pages of briefing in connection with these motions in order to locate the various exhibits. Moreover, defense counsel's "citation conventions" itself described certain exhibits merely in reference to other exhibits. *See, e.g.,* Resp. vii, ECF No. 74 (describing the Benton Deposition as "Exhibit H to the Herman Declaration" without any reference to where the Herman Declaration itself can be found on the docket and without any recognition that the exhibits to such declaration are listed

on the docket as exhibits 1–11 rather than alphabetically).

**IT IS SO ORDERED.**

